IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

**WESTFIELD INSURANCE COMPANY,**

      **Plaintiff,**

v.                                                                                                      Civil Action No. 5:14-cv-25227

**PINNACLE GROUP, LLC dba Aaron's;**
**JAMES P. BURMER; and RENEE L.**
**BURMER,**

      **Defendant.**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**PINNACLE GROUP LLC's MOTION FOR PARTIAL SUMMARY JUDGMENT**

      COMES NOW Defendant, Pinnacle Group, LLC, dba Aaron's ["Aaron's"], and respectfully submits its memorandum of law in support of a motion pursuant to Fed. R. Civ. P. 56 for partial summary judgment on the issues of whether the claims asserted against Aaron's in a suit styled <u>James P. Burmer and Renee L. Burmer v. Pinnacle Group, LLC, dba Aaron's</u>, Mercer County Civil Action No. 13-C-297, are covered under a policy of insurance issued by Plaintiff, Westfield Insurance Company ["Westfield"], to Aaron's, and/or whether Aaron's had a reasonable expectation of coverage that the type of claims asserted in <u>James P. Burmer and Renee L. Burmer v. Pinnacle Group, LLC, dba Aaron's</u>, Mercer County Civil Action No. 13-C-297, would be covered under the Westfield policy, stating as follows:

**I. STATEMENT OF FACTS**

      On March 26, 2013, Westfield issued a Commercial General Liability ["CGL Policy"] to Pinnacle. [Exhibit A]

      The Insuring Agreement under Coverage A of the CGL Policy provides:

> 1. **Insuring Agreement**
>
>    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

The term "bodily injury" is defined as follows:

> 3. "Bodily injury" means bodily injury, disability, sickness, or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

The term "property damage" is defined as follows:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The term "occurrence" is defined as follows:

> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

In addition Coverage A, the CGL Policy also provides Coverage B as follows:

> 1. **Insuring Agreement**
>
>    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may at our discretion investigate any offense and settle any claim or "suit" that may result. But:

2

The term "personal and advertising injury" is defined as follows:

> "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

The term "personal and advertising injury" is further defined to include:

> e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

On August 8, 2013, within the policy period, Aaron's was sued by Defendants, James P. and Renee L. Burmer. [Exhibit B] Although initially filed in Raleigh County, on August 28, 2013, the suit was transferred to Mercer County. [Exhibit C] The suit contained claims for violation of the Consumer Credit and Protection Act; for violation of Computer Crime and Abuse Act; for violation of the Telephone Harassment Act; for intentional infliction of emotional distress; and for common law invasion of privacy.[1] [Exhibit B]

Aaron's immediately advised Westfield's agent of receipt of the suit. [Exhibit D at 32] Although Aaron's initially believed that the suit would be dismissed, Aaron's managing member testified that "I assumed that if we were sued that the insurance would cover whatever they tried to bring at us." [Id. at 33] Westfield's agent responded that Aaron's defense costs would be covered. [Id. at 34] With respect to both the Burmers' statutory and common law claims, Aaron's managing

---

[1] Shortly before the scheduled trial, the Burmers moved to amend their complaint to withdraw their emotional distress claim and substitute a claim under the Consumer Goods Rental Protection Act, but that motion was never granted, and the claims currently pending in state court are under their original complaint.

member testified that because any statutory or common law violation by its employees would have been "accidental," he understood that those claims would be covered.[2] [Id. at 76-79]

Later, based upon its understanding that the Burmers' claims would be covered, Aaron's forwarded the invoices to Westfield for payment. [Id. at 35] Indeed, on December 31, 2013, Westfield's agent contacted the law firm representing Aaron's acknowledging receipt of Aaron's invoices for payment. [Exhibit F] On March 7, 2014, Aaron's counsel sent a copy of the Burmers' suit to Westfield's agent. [Exhibit G] On March 28, 2014, Aaron's counsel spoke with a Westfield claims representative who advised counsel to continue to defend the Burmers' suit and on April 21, 2014, the representative sent a letter stating as follows:

> We spoke a few weeks ago regarding the claim filed by the Burmer's against Pinnacle Group. At that time, I learned from you what the claim entailed and advised we have undertaken a coverage review by counsel. I also asked that you maintain the defense of the insured during our investigation of coverage.

[Exhibit H]

About two months later, however, Westfield's claim representative sent an unsigned letter dated June 12, 2014, disclaiming coverage. [Exhibit I] Later, after Aaron's protested the denial, Westfield sent another letter dated August 27, 2014, reaffirming its position. [Exhibit J] The next day, on August 28, 2014, with a state court trial date of September 18, 2014, looming, Westfield filed its declaratory judgment complaint against Aaron's and the Burmers. [ECF 1]

For the reasons below, Aaron's is entitled to partial summary judgment ruling that (1) the claims asserted against Aaron's in the Burmers' are covered under the CGL policy and (2) Aaron's had a reasonable expectation of coverage for the Burmers' suit, with the issues of Aaron's damages as a result of Westfield's denial of Aaron's demand for defense and indemnification to be decided later.

---

[2] Indeed, Westfield defended and indemnified another West Virginia Aaron's against similar claims in Willis v. Aaron's, Inc., Raleigh County Civil Action No. 12-C-66, using the same counsel to defend in that case now representing Westfield in this case. [Exhibit E]

4

## II. Discussion of Law

A.     **Summary Judgment Standard**

The interpretation of an insurance contract," it has been held, "including the question of whether the contract is ambiguous, is a legal determination . . . ." Syl. pt. 2, in part, West Virginia Mut. Ins. Co. v. Adkins, 234 W. Va. 226, 764 S.E.2d 757 (2014).  [Citation omitted].

Recently, in Syllabus Point 4 of Elk Run Coal Co., Inc. v. Canopius US Ins., Inc., 2015 WL 3649658 (W. Va.), the Court reiterated, "It is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." [Citation omitted]

Thus, "Any question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations."  Aetna Cas. & Sur. Co. v. Pitrolo, 176 W. Va. 190, 194, 342 S.E.2d 156, 160 (1986).

For example, "Where the policy language involved is exclusionary," as the language at issue in this case, "it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated."  Cherrington v. Erie Ins. Property and Cas. Co., 231 W. Va. 470, 498, 745 S.E.2d 508, 527 (2013).  [Internal quotation marks and citation omitted]

With respect to the issue of ambiguity, the Court restated in Syllabus Point 5 of West Virginia Inv. Management Bd. v. Variable Annuity Life Ins. Co., 234 W. Va. 469, 766 S.E.2d 416 (2014), "Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous."

Significantly, "A provision in an insurance policy may be deemed ambiguous if courts in other jurisdictions have interpreted the provision in different ways" because "one cannot expect a

mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance." Chafin ex rel. Estate of Bradley v. Farmers & Mechanics Mut. Ins. Co. of W. Va., 232 W. Va. 245, 250, 751 S.E.2d 765, 770 (2013). [Internal quotation marks and citations omitted].

"In determining whether under a liability insurance policy an occurrence was or was not an 'accident'—or was or was not deliberate, intentional, expected, desired, or foresee," our Court has held, "primary consideration, relevance, and weight should ordinarily be given to the perspective or standpoint of the insured whose coverage under the policy is at issue." Syl. pt. 2, Flowers v. Max Specialty Ins. Co., 234 W. Va. 1, 761 S.E.2d 787 (2014). [Citation omitted]

Finally, of particular relevance in this case, West Virginia applies the "last antecedent" rule.[3]

**B.  The CGL Policy Covers Claims for Invasion of Privacy**

As noted, the CGL policy provides coverage for "personal and advertising injury" defined to include "invasion of the right of privacy." [Exhibit A] Westfield relies upon the language "committed by or on behalf of its owner, landlord or lessor," but several courts have rejected that interpretation and the evidence is undisputed that Aaron's was a "lessor" of property to the Burmers.

In New Castle County v. National Union Fire Insurance Company of Pittsburgh, PA., 174 F.3d 338 (3rd Cir. 1999), for example, the policy provision at issue was as follows:

---

[3] See, e.g., Appalachian Power Co. v. Public Service Commission, 162 W. Va. 839, 845 n.3, 253 S.E.2d 377, 382 n.3 (1979)("A qualifying phrase is ordinarily confined to the last antecedent or to the words and phrases immediately preceding it; the last antecedent within the meaning of this rule has been regarded as the last word which can be made an antecedent without impairing the meaning of the sentence."); see also Blue v. Poling, 68 W. Va. 547, 70 S.E. 279 (1911)(applying "last antecedent" rule); Moore v. Dish Network, L.L.C., 2014 WL 5305960 (N.D. W. Va.)(applying "last antecedent" rule).

> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

With respect to this language, the Third Circuit held that the 'by or on behalf of' language . . . was ambiguous and should not be construed to preclude coverage" for a claim of invasion of privacy not alleged to have been committed by the "owner, landlord or lessor" of the premises. [Id. at 748] In so holding, the Third Circuit applied the last antecedent rule. [Id. at 344-351]

Similarly, in Lakeland Village Homeowners Association v. Great American Insurance Group, 727 F. Supp. 2d 887 (E.D. Cal. 2010), the policy provision was follows:

> (Pl.'s Evid., Ex. 12, at 1.) "Personal injury" is defined to include "injury, other than 'bodily injury,' arising out of . . . the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." (Id., at 3.)

Again, as in New Castle, supra at 894, the Lakeland court applied the last antecedent rule and held as follows:

> Since the clause "by or on behalf of its owner, landlord or lessor," is reasonably susceptible to more than one interpretation, it is ambiguous and must be construed in Plaintiff's favor. Therefore, Plaintiff's partial motion for summary judgment is granted and Defendant's cross motion for summary judgment is denied.

Finally, in FLM, Inc. v. Cincinnati Ins. Co, 973 N.E.2d 1167, 1171 (Ind. Ct. App. 2012), the policy provisions at issue stated as follows:

7

> *Id.* at 146. The CGL Policy defined "personal injury" as "injury other than "bodily injury" arising out of one or more of the following offenses: ... The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies by or on behalf of its owner, landlord, or lessor ..." *Id.* at 153.

As does Westfield in this case, the insurer argued in FLM, supra at 1175:

> [8] Cincinnati contends that, even if the abandoned sand's presence on FLM's Property constituted a wrongful entry or invasion of the right of private occupancy, the Policies' personal injury coverage is limited, in relevant part, to IRI's liability for: "The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies *by or on behalf of its owner, landlord, or lessor.*" Appellants' App. at 153 (emphasis added). Cincinnati asserts that the italicized language limits the coverage to only a wrongful entry or invasion of the right of private occupancy that is *by or on behalf of its owner, landlord, or lessor.* Therefore,

Applying the last antecedent rule, the FLM court held at 1176:

> Applying this rule of construction to the policy language at issue, it is clear that "by or on the behalf of" modifies "that a person occupies," the language that directly precedes it, and not the "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy" language. On this basis, we find that a different interpretation from the one proposed by Cincinnati to be entirely reasonable. Because this language in the Policies is subject to more than one reasonable interpretation, it is ambiguous, and must be construed against Cincinnati and in favor of coverage.

Not only have courts rejected Westfield's interpretation of the "invasion of the right of private occupancy" provision of its policy, courts have ruled that claims like those asserted by the Burmers are covered under the "oral or written publication of material that violates a person's right of privacy" provision of Westfield's policy.

In <u>Owners Ins. Co. v. European Auto Works, Inc.</u>, 695 F.3d 814, 822 (8th Cir. 2012), for example, the Eighth Circuit concluded that that there was coverage for the transmission of junk faxes holding that, "'[O]oral or written publication of material that violates a person's right of privacy' covers the TCPA claim at issue here for the sending of unsolicited fax advertisements. Such conduct involves a 'publication of material' (the sending of the unsolicited fax advertisement) that violates a 'right of privacy' (the right to seclusion based privacy protected by the TCPA)."[4]

Plainly, under West Virginia law, Westfield's argument regarding coverage for the Burmers' invasion of privacy claims is incorrect and Aaron's is entitled to summary judgment on the issue of whether the Westfield policy provided coverage, entitling Aaron's to a defense of the Burmers' suit and indemnification for any damages awarded against Aaron's on the Burmers' invasion of privacy claim.

**C.     The CGL Policy Covers the Other Statutory and Common Law Claims**

As noted, the Burmers' complaint asserted not only an invasion of privacy claim clearly within Coverage B, but other statutory and common law claims within Coverage A.

---

[4] See also <u>Penzer v. Transp. Ins. Co.</u>, 29 So.3d 1000, 1005 (Fla. 2010)(sending unsolicited facsimile transmissions was "written publication of material that violates a person's right of privacy" for purposes of "invasion of privacy" coverage); <u>Motorist Mut. Ins. Co. v. Dandy-Jim, Inc.</u>, 182 Ohio App. 3d 311, 912 N.E.2d 659 (2009)(insured's transmission of unsolicited faxes could trigger advertising injury coverage arising out of "oral or written publication of material that violates a person's right of privacy); <u>Schuetz v. State Farm Fire & Casualty Company</u>, 147 Ohio Misc.2d 22, 890 N.E.2d 374 (2007)(consumer's complaint arising from unsolicited telemarketing calls alleged conduct that could potentially constitute "advertising injury" defined to include "oral or written publication of material that violates a person's right of privacy").

With respect to Coverage A, Westfield argues that (a) there is no allegation of "bodily injury;" (b) there is no allegation of "property damage;" (c) the policy excludes coverage under an "expected and intended from the standpoint of the insured" provision; and (d) there is no coverage under exclusions related to suits under several federal statutes. [ECF 1 at 24-25] Again, Westfield's arguments lack merit.

*First*, as noted, the term "bodily injury" is defined in the CGL policy to include "mental anguish." [Exhibit A]  Here, not only do the Burmers allege that they suffered "emotional distress," but that such emotional distress arose from being "annoyed, inconvenienced, harassed, bothered, upset, angered, harangued and otherwise caused indignation and distress."  [Exhibit B]  Where "physical manifestation[s]" of emotional distress are present, the CGL policy's definition of "bodily injury" is satisfied.  See Charleston Area Medical Center, Inc. v. National Union Fire Ins., 2011 WL 2161534 at *8 (S.D. W. Va.)("Another type of bodily injury is physical symptoms or manifestations of emotional or mental injury.").

*Second*, as noted, the term "property damage" is defined in the CGL policy to include "loss of use" to "tangible property that is not physically injured." [Exhibit A]  Here, the Burmers are seeking "compensatory damages" for Counts II, III, IV, and V of their complaint. [Exhibit B]

With respect to Count II, the applicable statute provides, "Any person whose property or person is injured by reason of a violation of any provision of this article may sue therefor in circuit court and may be entitled to recover for each violation . . . Compensatory damages." W. Va. Code § 61-3C-16(a)(1).

With respect to Count III, the applicable statute provides, "Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of

the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages." W. Va. Code § 55-7-9.

With respect to Count IV, "any compensatory damages or special damages" could be awarded. Syl. pt. 2, Tudor v. Charleston Area Medical Center, Inc., 203 W. Va. 111, 506 S.E.2d 554 (1997).

With respect to Count V, "When a plaintiff has established liability for invasion of privacy, the plaintiff is entitled to recover damages for (1) the harm to his/her interest in privacy resulting from the invasion; (2) his/her mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; (3) special damages of which the invasion is a legal cause; and (4) if none of the former damages is proven, nominal compensatory damages are to be awarded." Syl. pt. 3, Rohrbaugh v. Wal-Mart Stores, Inc., 212 W. Va. 358, 572 S.E.2d 881 (2002).

The term "loss of use" when used in an insurance policy's definition of "property damage," particularly when that definition also includes a reference to "tangible property that is not physically injured," is afforded a broad interpretation.[5]

As one court observed, "In 1973, insurers revised their definition of 'property damage' and adopted the current two-prong definition because the old definition, 'injury to or destruction of tangible property,' resulted in inconsistent interpretations of the phrase—some courts found that the definition included non-physical injuries while other courts denied coverage unless physical contact

---

[5] See, e.g., Spada v. Unigard Ins. Co., 80 Fed. Appx. 27, 29 (9th Cir. 2003)("The letters may be reasonably construed to allege current 'loss of use' to the public right-of-way and perhaps to neighboring properties, which were placed in danger as a result of the condition of the Spadas′ property. . . . We conclude that the letters were ambiguous and so resolve those ambiguities against Unigard. Thus construed, the letters stated a claim within Unigard′s duty to defend."); IMG Worldwide, Inc. v. Westchester Fire Ins., Co., 2012 WL 6553277 at *1 (N.D. Ohio)("[E]ven if the Defendants were correct that 'property damage' and its contractual definition 'loss of use of tangible property that is not physically injured' appear to be facially unambiguous, Ohio courts and the Sixth Circuit have recognized that facially unambiguous language in an insurance contract may become ambiguous when applied to a specific fact pattern.").

between the insured and the injured property existed." Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447 (D. N.J. 1998). [Citation omitted]

That same court provided the following example to illustrate the change: "The classic example of a loss of use injury is a case in which a manufacturer of construction cranes sells a defective crane which collapses in front of a restaurant, thereby impairing the restaurant's income. If the restaurant sues the manufacturer and recovers the lost income, the manufacturer would be covered by the 'loss of use' component of the CGL policy." Id. at 453-454 [Citation omitted]

Under West Virginia law, "As a general rule, an insurer's duty to defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage. Furthermore, it is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy. This ordinarily arises by virtue of language in the ordinary liability policy that obligates the insurer to defend even though the suit is groundless, false, or fraudulent." Aetna Casualty v. Pitrolo, 176 W. Va. 190, 194, 342 S.E.2d 156, 160 (1986).[6]

Consequently, "An insurance company has a duty to defend an action against its insured if the claim stated in the underlying complaint could, without amendment, impose liability for risks the policy covers." Bowyer v. Hi-Lad, Inc., 216 W. Va. 634, 651, 609 S.E.2d 895, 912 (2004).

---

[6] See also Cornerstone Title & Escrow, Inc. v. Evanston Ins. Co., 555 Fed. Appx. 230, 234 (4th Cir. 2014) (applying Maryland law)("the duty to defend 'should be construed liberally in favor of the policyholder,' . . . and it attaches 'when there exists a potentiality that the claim could be covered by the policy,' . . . Even a slim possibility can constitute a 'potentiality.' . . . 'If there is a possibility, even a remote one, that the plaintiffs' claims could be covered by the policy, there is a duty to defend.'). And 'any doubts about the potentiality of coverage must be resolved in favor of the insured.'"). [Citations omitted]

Here, affording the Burmers' Complaint its liberal interpretation dictated by West Virginia, its claims of "compensatory damages" and "special damages" could well include the "loss of use" of "tangible property that is not physically injured" and, consequently, its claims are covered by Coverage A under the CGL policy, particularly with respect to Westfield's obligation to provide a defense, which is broader than its duty to indemnify.

*Third*, with respect to Westfield's reliance on an exclusion for "expected and intended from the standpoint of the insured," as has been noted, our Court has held, "primary consideration, relevance, and weight should ordinarily be given to the perspective or standpoint of the insured whose coverage under the policy is at issue." Syl. pt. 2, Flowers, supra.

Here, the Burmers complain about telephone calls and visits to their home and, obviously, even though someone affirmatively made those telephone calls and visits to their home, just like someone affirmatively gets behind the wheel before embarking on a journey that may result in an accident covered by an automobile liability insurance policy, Aaron's managing member testified that by making those telephone calls and visits to the Burmers' home, there was never any intention to violate any of their statutory and/or common law rights. [Exhibit D at 76-79] Consequently, the "expected and intended" exclusion does not bar coverage for the Burmers' claims.

*Finally*, none of the federal statute exclusions relied upon by Westfield state as follows:

> q. **Distribution Of Material In Violation Of Statutes**
>
> "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> (1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or
>
> (2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or
>
> (3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

13

None of the Burmers' claims are asserted under the TCPA or CAN-SPAM Act and, obviously, their common law invasion of privacy and emotional distress claims do not arise from any statute, ordinance, or regulation. Accordingly, these exclusions have no application to this case. See, e.g., Nationwide Mut. Ins. Co. v. Harris Medical Associates, LLC, 973 F. Supp. 2d 1045, 1056 (E.D. Mo. 2013)("Under these circumstances, the Court concludes plaintiffs have not established that there is no potential for coverage for the underlying conversation claim based on the Violation of Statutes exclusion.").

D.   **Aaron's Had a Reasonable Expectation of Coverage**

In Syllabus Point 8 of National Mut. Ins. Co. v. McMahon & Sons, Inc., 177 W. Va. 734, 742, 356 S.E.2d 488, 496 (1987), overruled on other grounds by Potesta v. United States Fid. & Guar. Co., 202 W. Va. 308, 504 S.E.2d 135 (1998), our Court held, "With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations."[7]

In New Hampshire Ins. Co. v. RRK, Inc., 230 W. Va. 52, 736 S.E.2d 52 (2012), for example, the Court held that an insured may have had a reasonable expectation of coverage despite

---

[7] To the extent that the law of Tennessee may apply as the Westfield policy was placed by one of Westfield's Tennessee agents to Aaron's which is headquartered in Tennessee, it also applies the doctrine of reasonable expectations. See, e.g, Harrell v. Minnesota Mut. Life Ins. Co., 937 S.W.2d 809, 810 (Tenn. 1996)("After careful consideration, we have determined that we should join the growing number of jurisdictions which have abandoned the distinction between 'accidental means' and 'accidental results.' We do so because the distinction is contrary to the understanding and reasonable expectations of the average insurance policyholder . . . ."); Board of Trustees v. Graves, 1999 WL 1086454 at *4 (Tenn. Ct. App)("[T]he courts should construe an insurance policy keeping in mind the 'understanding and reasonable expectations of the average insurance policyholder,' . . . rather than the more sophisticated understanding of a 'Philadelphia lawyer.'")(Citation omitted); Ryan v. MFA Mut. Ins. Co., 610 S.W.2d 428, 436 (Tenn. Ct. App. 1980)("an insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit")(Citation omitted).

14

exclusionary language that would have otherwise precluded it based upon representations made to the insured by the insurer's agent.  In addition to restating its holding in Syllabus Point 8 of McMahon & Sons, the Court reiterated in Syllabus Point 5 of RRK that, "Once an insurer creates a reasonable expectation of insurance coverage, the insurer must give the coverage or promptly notify the insured of denial." [Internal quotation marks and citation omitted]

In this case, as noted, Aaron's had a reasonable expectation, based upon the representations of Westfield's agent when the Burmer suit was first reported by Aaron's to Westfield's agent; based upon the requests by Westfield's agent for transmittal of Aaron's attorney fee invoices incurred about the defense of the Burmer suit; based upon the request by Westfield's claim representative that Aaron's attorney continue in his defense of the Burmer suit; and based upon Westfield's complete failure to promptly notify Aaron's of the denial of coverage.

In RRK, supra at 58, 736 S.E.2d at 58, the Court observed, "[T]he doctrine of reasonable expectations has evolved to apply to cases, such as Romano and Keller, in which a policy provision on which denial of coverage is based differs from the prior representations made to the insured by the insurer. See Luikart v. Valley Brook Concrete & Supply, Inc., 216 W.Va. 748, 755, 613 S.E.2d 896, 903 (2005); Am. Equity Ins. Co. v. Lignetics, Inc., 284 F.Supp.2d 399, 404–06 (2003)." Based upon the undisputed evidence in this case, the same analysis applies.

As explained in the testimony of Aaron's managing member, his Westfield agent had a 10 percent ownership interest in the company.  [Exhibit D at 9, 10]  In fact, two of Westfield's agents, including one with a 10 percent ownership interest in Aaron's, presented the policy proposal to Aaron's knowing that the business it conducted exposed Aaron's to the type of claims asserted by the Burmers.  [Id. at 10-11]  Westfield's managing member testified as follows:

15

> A. We approached Price Ramey and gave them the insurance criteria that Aaron's gave us, and met with Brad, talked about the business model. And then Brad came and brought Fred Lamay, and he talked and told us that he represented another large rent-to-own in the air, Easy Rentals. Same model. And gave us a price. Presented the product and we accepted it.

[Id. at 17] With respect to Aaron's exposure to suits arising from its collection activities, its managing member testified as follows:

> Q. Okay. Do you recall anyone, either Brad or Fred, ever specifically telling you that claims by customers over improper collection activities or anything of that nature would be covered under the Westfield policy?
> A. That and -- we talked about a variety of things that a business owner's concerned about when you get insurance. Everything from associates that you employ, the vehicles on the road, and how we interact with customers. And to my knowledge, everything that was a concern of mine was covered.
>
> Q. And just to be clear, when I say problems with collection activities, I mean efforts by Pinnacle to either get paid after you've rented personal property to a customer or efforts to collect back that personal property that you rented when the customer either hasn't paid or their period has expired and they haven't returned it, anything of that nature?
> A. Westfield, they understand our business model. They insure -- that was one of things we talked about. We already insure several people in exactly what you do, in the rent-to-own business. And it was explained to me, it's a comprehensive insurance policy for our particular kind of business. Which does involve everything from delivering merchandise in people's

16

> homes, collecting payments for the product. Service issues on the product. Transportation of the product, those sorts of things.

[Id. at 19-20]

Aaron's managing member explained that he contacted defense counsel regarding the Burmer litigation after being referred by the owner of another West Virginia Aaron's, which is the same Aaron's defended by Westfield for similar claims in <u>Willis v. Aaron's, Inc.</u>, Raleigh County Civil Action No. 12-C-66. [Id. at 25, 29-30] Initially, Aaron's managing member testified that Westfield's agent assured him that the Burmers' suit against Aaron's would be covered:

> Q. Did you specifically ask him not to turn it into the insurance?
> A. No. I did tell him that I understood that what we had initiated would not be covered, and our first legal action towards the Burmers. But all along, I assumed that if we were sued that the insurance would cover whatever they tried to bring against us.
> Q. Did he tell you that?
> A. It was -- it was the reason we had the insurance. Just if something like an event like that happened, it would be -- we would be covered. And he obviously suggested that we would be. It was more a defense coverage than an offensive coverage. They're not in the business of paying for legal fees if we're going after people, but if we are sued by someone, it would protect us.
> Q. Well, I understand that you've testified that was your understanding of what it was. Did Brad Jenkins or someone else at Price Ramey specifically say that to you?
> A. Yes.

17

> Q. Who said it and when?
> A. Brad Jenkins. And the same conversation where he said it wouldn't be covered if we were offensively doing it, but as an a defensive mechanism it would be, if we found ourselves as a defendant.

[Id. at 33-34]

Moreover, the representations of Westfield's agent specifically concerning Westfield's coverage for the Burmer suit were consistent with what Aaron's had been told when purchasing the policy:

> Q. Okay. Let's start with anybody from Westfield, the company itself. Some corporate representative or attorney representing Westfield, did anyone from Westfield itself ever suggest or imply that Westfield would be providing a defense?
> A. When Fred Lamay was there, he talked about the companies that they covered, that they were -- they provided comprehensive coverage for this kind of industry, our industry. And pretty much led me to believe he understood the nature of our business. And having customers who would make some kind of allegation because you're trying to collect for some reason, it's going to happen. I mean it's just part of the deal. You don't know when and you hope it wouldn't happen a lot, but it's just part of our --

[Id. at 73]

Accordingly, Aaron's had a reasonable expectation that the Burmers' claims would be covered by the Westfield policy.[8]

WHEREFORE, Defendant, Pinnacle Group, LLC, dba Aaron's, respectfully requests entry of partial summary judgment ruling that (1) the claims asserted against Defendant in a suit styled James P. Burmer and Renee L. Burmer v. Pinnacle Group, LLC, dba Aaron's, Mercer County Civil Action No. 13-C-297, are covered under a policy of insurance issued by Plaintiff, Westfield Insurance Company, to Defendant and (2) Defendant had a reasonable expectation of coverage that the claims asserted in James P. Burmer and Renee L. Burmer v. Pinnacle Group, LLC, dba Aaron's, Mercer County Civil Action No. 13-C-297, would be covered under the policy.

**PINNACLE GROUP, LLC**

By Counsel

/s/ Ancil G. Ramey
Ancil G. Ramey, Esq.
WV Bar No. 3013
Steptoe & Johnson PLLC
P.O. Box 2195
Huntington, WV 25722-2195
Telephone (304) 526-8133
ancil.ramey@steptoe-johnson.com

---

[8] Tennessee Supreme Court has held that "an insurance company is bound by all acts, contracts, or representations of its agent, whether general or special, which are within the scope of his real or apparent authority." Bill Brown Constr. Co., Inc. v. Glens Falls Ins. Co., 818 S.W.2d 1, 4 (Tenn. 1991) (quoting COUCH ON INSURANCE 2D § 71.9, n. 8).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**WESTFIELD INSURANCE COMPANY,**

    **Plaintiff,**

v.                                         Civil Action No. 5:14-cv-25227

**PINNACLE GROUP, LLC dba Aaron's;
JAMES P. BURMER; and RENEE L.
BURMER,**

    **Defendant.**

### CERTIFICATE OF SERVICE

      I hereby certify that on June 25, 2015, I electronically filed MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PINNACLE GROUP LLC's MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Brent K. Kesner, Esq.
Tanya M. Kesner, Esq.
Kesner & Kesner, PLLC
P.O. Box 2587
Charleston, WV 25329
*Counsel for Westfield*

Steven R. Broadwater, Esq.
Hamilton, Burgess, Young & Pollard, pllc
P.O. Box 959
Fayetteville, WV 25840
*Counsel for Burmers*

                                         /s/ Ancil G. Ramey
                                         Ancil G. Ramey, Esq.
                                         WV Bar No. 3013